## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ANTHONY RICHARDSON, JR.,**            **CIVIL ACTION**
  **Plaintiff**

**VERSUS**                               **NO. 14-1712**

**SEACOR LIFTBOATS, LLC**           **SECTION "E"**
  **Defendant**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Anthony Richardson, Jr. ("Richardson"), asserts ordinary negligence claims pursuant to the general maritime law against Defendant, SEACOR Liftboats LLC ("SEACOR"), the operator of the SEACOR INTERVENTION ("INTERVENTION"). Richardson alleges he sustained personal injury during a crane personnel basket transfer from the SEACOR INTERVENTION to the M/V CHASE. The questions presented at the trial were whether SEACOR was negligent and, if so, whether this negligence was the legal cause of Richardson's injuries.

This matter was tried before the Court, sitting without a jury, over three days.[1] The Court heard testimony from Jed Johnson, Carlos Herbert, Jack Madeley, Anthony Richardson, Jr., Dr. Paul Fenn, Dr. Angel Roman, Dr. Kenneth McCoin, Ryan Ross, Dr. Gordon Nutik, Dr. Kenneth Boudreaux, Dr. Larry Stokes, K.C. Guidry, and Robert Watson and admitted into evidence the deposition of Captain James Dean.[2] Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent any finding

---

[1] R. Docs. 69, 71, and 72 (minute entries for proceedings held June 15, 2015 through June 17, 2015).
[2] Trial Exhibit 54.

of fact may be construed as a conclusion of law, the Court adopts it as such. To the extent any conclusion of law may be construed as a finding of fact, the Court adopts it as such.

## FINDINGS OF FACT

On April 21, 2013, Richardson was employed by Greene's Energy Group as an offshore technician working aboard the INTERVENTION, a liftboat operated and manned by SEACOR. After a morning safety meeting on April 21, 2013, Richardson and two other workers, Carlos Herbert and Randy Rodriguez, were scheduled to return to shore. To get them from the INTERVENTION to the waiting crew boat, the M/V CHASE, a hydraulic crane was used to conduct a Billy Pugh personnel basket transfer. Richardson had completed personnel basket transfers numerous times before April 21, 2013. He had been adequately trained on how to safely ride personnel baskets.

The crane on the INTERVENTION, used to lift the basket from the INTERVENTION to the M/V CHASE, was operated by Jed Johnson ("Johnson"), a SEACOR employee. Johnson was an experienced, certified crane operator who was qualified and capable of performing personnel basket transfers.[3] The sea and weather conditions at the time of the incident were appropriate for performing personnel basket transfers, even though there were three-foot to four-foot choppy seas and rolling waves known as swells. There were no mechanical issues with the crane, and the hydraulic crane was mechanically incapable of lowering the personnel basket in a free-fall.

These basic facts found by the Court above are not in dispute, but there are two divergent versions of how events unfolded during the actual transfer: Richardson's

---

[3] Johnson testified that he was a Class A crane operator and had performed thousands of personnel basket transfers at the time of the incident.

version—supported by his testimony and that of his co-worker Carlos Herbert ("Herbert")—and Johnson's version—supported by his testimony and that of Ryan Ross ("Ross"), K.C. Guidry ("Guidry"), and Captain James Dean ("Captain Dean").

<u>The Incident</u>

Richardson testified at trial the basket transfer started off normally, but that once the basket cleared the INTERVENTION deck and was over the water, Johnson lowered the basket at an unsafe speed and then brought it to an abrupt stop. Richardson testified that, after a few seconds, or maybe even a minute, the basket felt like it went into an eight-foot to ten-foot free-fall. Richardson testified he had one foot on the basket and one foot slightly off the basket in a bracing position, as he was trained. He testified the basket slammed onto the deck of the M/V CHASE, and he never stepped or jumped off the basket before it landed. Richardson further testified that, when he tried to exit the basket after it slammed onto the deck, Johnson jerked the basket back into the air before Richardson had fully disembarked, causing Richardson's foot to become tangled in the netting of the personnel basket and his leg to be raised about chest high. Richardson testified a deckhand helped keep him from falling to the deck after he extricated himself from the basket. Richardson testified at trial his hip and back had been injured during the incident but also testified that he did not feel any back pain the day the incident occurred and was able to carry his bags weighing approximately 30 pounds from the crew boat.

Richardson testified that immediately after the personnel basket transfer he reported the incident to the captain of the M/V Chase, Captain Dean, and that Captain Dean told him he saw the three workers jump off the basket. Richardson testified he immediately told Captain Dean this was not true. Less than 30 minutes after the

incident occurred, Richardson filled out an incident report apparently provided to him by Captain Dean.[4] Under the section of the report labeled "detailed description of incident," Richardson wrote: "Personnel basket was operated wrecklessly [sic]. Personnel was lowered on basket, when personnel was exiting basket[,] basket lifted while one leg was still on basket. Medical attention not necessary at the present time of incident." Richardson did not make any specific mention in the report of the basket being lowered extremely quickly, dropping eight to ten feet in a free-fall, or slamming onto the deck of the M/V CHASE. In the section labeled "nature of injury," Richardson reported there was injury to his "leg."

Later that same day, Richardson filled out a handwritten statement for his employer, Greene's Energy Group.[5] In the statement, Richardson wrote:

> [The three workers] were being lowered on to the boat via personnel basket, when the crane operator let the personnel basket down extremely fast. The basket hit the boat deck, while [Richardson] was in a bracing position, in fear that the basket would strike the deck abruptly, with one leg bent on the basket, and the other leg slightly off to absorb the impact. [T]he crane operator jolted the basket and crane upward as if trying to jar [Richardson] from the basket, because of the basket striking the deck, [Richardson's] foot got caught in the nets. When [the crane operator] picked up on the basket with the crane he pulled [Richardson's] leg upward hyperextending it towards [Richardson's] face. Once [the crane operator] saw [Richardson] in an awkward position he quickly drop [sic] the basket causing [Richardson] to trip backward, the boat hand caught [Richardson] and [Richardson's] hard hat flew off."

Richardson also mentions in this statement that Captain Dean "accused [Richardson] of lying about the incident saying the [three workers] jumped off [the basket] before it hit the deck, when clearly there is no way that happened if [Richardson's] leg was caught on the basket. . . ."

---

[4] Trial Exhibit 2.
[5] Trial Exhibit 25.

Richardson admitted at trial that he was trained not to step off the basket before it safely lands on the deck of an awaiting vessel, though he stated he was trained to have one foot off the basket preparing to step off the basket once it lands. Although Richardson wrote in his Greene's statement and testified at trial that he had one foot slightly off the basket in a bracing position before it landed, Richardson testified at his deposition that he had two feet on the ring when the personnel basket hit the deck of the crew boat. The inconsistency in Richardson's testimony on this major point of contention and other inconsistencies undermine Richardson's credibility.[6]

Another Greene's Energy Group employee riding the personnel basket, Carlos Herbert, testified at trial and gave a very similar version of events to that given by Richardson. During the basket transfer, Herbert testified the crane operator started dropping them rapidly. When the basket hit the deck of the M/V CHASE, Herbert testified he quickly got off the basket, but Richardson was unable to get off as quickly. Herbert testified Johnson then lifted the basket, and Herbert saw Richardson's leg in the air caught on the basket.

Herbert also gave a handwritten statement to his employer, Greene's Energy Group.[7] Herbert wrote in the statement: "Being lowered from the life boat to crew boat by man lift, when the crane operator started letting the basket down extremely to [sic] fast. The

---

[6] For example, Richardson has been out of work for two years. At trial, Richardson listed a number of employers he remembered applying to for light duty jobs, but at his deposition, Richardson could not name any of those employers when asked. Additionally, Richardson has been performing numerous exercises, such as a modified version of P90x, agility exercises, squats, sit-ups, push-ups, jogging stadium stairs, and riding stationary bikes, with little to no pain. However, Richardson never told this to his treating physician, Dr. Fenn, and Richardson also admitted at trial that he did not inform Dr. Fenn of some of his prior medical history and his alcohol and drug use history. Defendant's independent medical examiner, Dr. Gordon Nutik, also met with Richardson. At that time, Richardson told Dr. Nutik he had back pain on the day of the incident, although Richardson testified at trial that he did not initially have back pain and did not list an injury to his back on the incident reports. Dr. Nutik also stated that there were inconsistencies during his physical examination of Richardson, and his opinion was that Richardson was controlling and manipulating the results of the exam.

[7] Trial Exhibit 43.

basket hit the deck. The crane operator suddenly picked up on basket making [Richardson] do a [split] then lowering the basket back down . . . ." Herbert's statement also references the fact that Captain Dean told the three workers who were transferred that they jumped off the basket before it landed, and Herbert wrote this statement was "not a true statement." Much of the language in Herbert's statement mirrored Richardson's statement. Herbert testified he was trained to have one foot off the basket waiting to land but admitted he was never trained to jump from a personnel basket, even if he thought it was going too fast, because such an action would be unsafe.

Herbert's testimony differs from that of Richardson with respect to how many times the basket stopped before it finally landed on the deck of the crew boat. There also are numerous inconsistencies within Herbert's own testimony. At trial, Herbert testified that he had one foot off the basket preparing to disembark once the basket landed on the deck of the M/V CHASE and that he got off the basket once it landed and absolutely did not jump off the basket prematurely. However, in a previous statement given to an investigator, he said he got off the basket before it hit the deck and was "able to get off real fast because I'm already thinking you know when this basket comes close I'm jumping off anyway."[8] He said he "timed it" because "he was scared."[9] Additionally, when asked at trial how familiar he was with Richardson, Herbert testified that he worked four or five different jobs with Richardson prior to the incident, but in the statement to the investigator he stated he worked on over fifty jobs with Richardson.[10]

Johnson, the crane operator, and other workers on the INTERVENTION and M/V CHASE painted a very different and more credible picture of what occurred during

---

[8] Trial Exhibit 45–319.
[9] *Id.*
[10] *Id.* 45–324.

the transfer. Johnson testified at trial that everything about that day and the beginning of the personnel basket transfer was normal. He stopped the basket about four to six feet above the deck of the M/V CHASE to evaluate sea conditions and to give Captain Dean the opportunity to reposition the M/V CHASE, if necessary. Based on his experience as a crane operator, Johnson testified the correct method of lowering a personnel basket when the waiting vessel is riding a swell is to wait until the vessel gets to the crest of the swell and then lower the basket to the deck as the boat descends to the bottom of the trough and immediately slack off the crane line suspending the basket.

Johnson testified that, when the basket was stationary four to six feet above the deck, the M/V CHASE came up on a swell. The boat's rise on the swell caused the gap between the basket and the deck of the M/V CHASE to lessen to about a one-foot to two-foot gap. Johnson testified that, when the boat was at the crest of the swell, Richardson took one foot off the basket and attempted to step onto the deck before the basket landed. While Richardson was attempting to step off the basket with one foot, the vessel descended to the trough of the swell, and the gap between the basket and the deck increased. Johnson testified he feared Richardson would fall off the basket completely, so he had to react quickly and get the basket on the deck as soon as possible for Richardson's safety. Johnson testified that, when a rider steps off the basket too early and it appears the rider may fall, the crane operator is trained to slack off the crane line completely and get the basket on the deck as soon as possible. In this case, Johnson quickly lowered the basket to the deck and slacked off the line completely to land the basket on the deck and keep it there. Johnson testified this was the only way to eliminate the gap between the basket and the deck and to keep Richardson from falling from a dangerous height. Johnson testified that, once he lowered the basket to the deck,

he never lifted it again until the men had retrieved their bags and exited the basket.

Johnson testified the proper training for riders in a personnel basket transfer is to keep both feet on the basket until the basket lands on the deck. Although Johnson testified that he often sees people taking a foot off the basket a second or two before it touches in anticipation of dismounting and stepping off the basket, it is not common for people to do so when the basket is still one or two feet above the deck. He also testified Richardson was not merely stepping off the basket at the last minute as the basket was landing on the deck, but rather Richardson was dangling one foot off the basket and trying to step onto the deck as the boat fell on the swell. Johnson testified he was concerned that Richardson would fall off the basket and onto the deck of the crew boat if Johnson did not immediately lower the basket.

Johnson's testimony was corroborated by that of Ryan Ross ("Ross"), who was subpoenaed to testify at trial. Ross is a certified crane operator who worked for SEACOR at time of the incident and was aboard the INTERVENTION when it occurred. He was not involved in the transfer itself but testified that he witnessed the events unfold. Ross also testified that he was trained to maintain two feet on the basket with bent knees until the basket securely lands on deck—never to take one foot off the basket before that time. Although he had seen people take one foot off in anticipation of landing, and may have even done so himself at times, he stated this is not how personnel are trained. Ross testified that anytime he or others had taken a foot off the basket, it had been only when the basket was about to touch the deck.

With respect to the events in question, Ross testified he witnessed the basket stop about four or five feet above the deck of the crew boat. He said the crew boat rose on a wave and at that point he saw Richardson step off the basket. At the moment

Richardson stepped off, the crew boat began falling off the wave. Ross testified that Johnson then lowered the basket to the deck. Ross testified there is no training for crane operators on how to handle this exact situation—the operator just must use his experience to do whatever is best to protect the safety of the rider. Ross further testified the basket did not free-fall or slam into the deck, he did not see Richardson's foot get caught in the webbing of the basket, and the crane operator never lifted the basket back up until all personnel were off the basket.

K.C. Guidry ("Guidry"), a worker aboard the INTERVENTION who had never worked for SEACOR or any of its companies, also was subpoenaed and gave testimony corroborating Johnson's testimony at trial. Guidry testified he received training concerning personnel basket transfers at three companies, and all of the training was essentially the same—workers are trained to keep both feet on the basket until it lands. He had never been trained to take one foot off before it lands. However, he testified at times he would take one foot off to prepare to land but admitted this can be unsafe. Guidry testified that during the personnel basket transfer, he never saw the basket lowered extremely quickly. Rather, it descended slowly and steadily all the way down to the deck of the crew boat. He did not see the basket slam down onto the deck. According to Guidry, when the basket was about two or three feet away from the deck of the crew boat, he saw Richardson step off the basket before the basket touched the deck of the crew boat. At that point, he saw Johnson quickly lower the basket to the deck. Guidry testified the basket was never lifted back in the air until after the men exited and retrieved their bags.

Johnson's version of events is further corroborated by the deposition testimony of Captain Dean, an employee of Alliance Offshore, LLC at the time of the incident.

Captain Dean witnessed the transfer from the M/V CHASE and testified at his deposition that the basket was lowered at a normal rate of speed. Further, he testified that he saw Richardson jump or step off the basket before the basket landed on the deck of the M/V CHASE while the basket was around one or two feet above the deck. Captain Dean stated there was no free-fall of the basket, and Richardson's foot never got stuck in the webbing.

The Court does not find the testimony of Richardson and Herbert credible as to how the events unfolded during the personnel basket transfer. Instead, the Court finds the testimony of Johnson, Ross, Guidry, and Captain Dean more credible and accepts their testimony as fact. Neither Guidry nor Captain Dean has ever had an employment relationship with SEACOR, and both corroborated Johnson's testimony. Ross, who also corroborated Johnson's testimony, no longer works for SEACOR. Ross and Guidry were subpoenaed to testify at trial.

The Court finds that the personnel basket transfer was conducted at an appropriate rate of speed. When the basket was stationary above the deck of the M/V CHASE and before the basket had securely landed on the deck, Richardson prematurely stepped one foot off the basket and attempted to step on to the deck. As he did so, the crew boat fell off the swell, increasing the gap between the basket and the deck, and as a result Richardson was unable to step onto the deck. Johnson believed that Richardson was in danger of falling off the basket and, in response, lowered the basket to the deck. Johnson did not lift the basket until Richardson and the other riders had retrieved their bags and completely exited the basket.

The Experts

Both Richardson and SEACOR had experts testify concerning the proper way to

conduct personnel basket transfers. Plaintiff's expert, Jack Madeley ("Madeley"), was a certified crane operator over 30 years ago. Now, he regularly testifies in a wide variety of safety cases. The safety of crane personnel basket transfers is not his primary area of expertise, and the Court finds that his experience and expertise with respect to crane operations, and particularly with respect to training personnel basket riders and crane operators, does not match that of SEACOR's expert.

At trial, Madeley admitted that Johnson was properly trained and certified as a crane operator to conduct personnel basket transfers. Madeley's testimony at trial was that during this particular transfer, Johnson failed to safely land the basket on the deck and failed to comply with industry standards for conducting basket transfers. Madeley testified that the proper time to set a personnel basket down on the deck of a waiting crew boat when there are swells is at the moment the boat is at crest of a swell, at which time the crane operator should immediately slack off the line so that the basket will stay on the deck as the vessel descends. In this case, Madeley testified Johnson failed to begin lowering the basket as the M/V CHASE neared the crest of the swell. However, Madeley could point to no authority to support his position that this method of lowering the basket is the industry standard. In fact, Madeley admitted at trial that crane operators determine how and when they will actually lower the basket to the deck differently based upon conditions at the time. Madeley later testified he believed the proper method of lowering the basket he described and the method described by Johnson are pretty much one and the same.

Madeley also testified the proper way to train personnel regarding personnel basket transfers is for riders to keep one foot on the basket and one foot off when the basket is approaching the deck, but again he could not point to any specific authority for

this assertion. Madeley admitted, though, a person should not step off the basket if the basket is still being lowered, and he would not recommend anyone jump off the basket while it is one foot above the deck of the crew boat. He agreed the industry best practice is to wait until the basket lands and not to step off when the basket is still being lowered.

Defendant's expert, Robert Watson ("Watson"), was a crane operator for a number of years. Later, he inspected cranes and then went into safety training. At trial, he estimated he had trained in excess of 800 crane operators, 300 to 400 riggers, and 350 qualified inspectors. He also testified he had trained approximately 1,000 people on how to properly ride a personnel basket. Watson is also on the American Petroleum Institute ("API") committee that developed industry standards for crane operations.

Watson testified the proper way to train riders is to tell them to step on the basket, place both feet on the outer ring, intertwine both arms in the netting, and stay on the basket until it rests on the deck. At the point the basket touches the deck, riders should then immediately get off. Watson testified that riders are always trained to keep both feet on until the basket reaches the deck and that it is not safe to take a foot off beforehand because this action could affect the rider's balance. Watson testified that Billy Pugh publishes recommended practices that are in accord with these instructions. According to Watson, this training is the best practice in the industry and this is how he personally trains riders.

Watson's opinion at trial was that Johnson followed all rules and regulations and was not negligent when performing the transfer. He stated a crane operator should hold the basket about eight to ten feet above the deck to re-evaluate sea conditions and give the Captain of the crew boat a chance to reposition the boat. Then, the crane operator should lower the basket to four or five feet above the deck where he will pause to again

evaluate sea conditions and time the landing. Watson listened to Madeley's testimony and disagreed with Madeley's opinion that the basket should be placed on the deck of the waiting boat when the boat is at the crest of a swell. Watson testified that, if this method is used, the rider may attempt to get off the basket at the crest of the swell and the crew boat may drop out from underneath him when the boat falls on the swell. Instead, Watson opined that the crane operator should lower the basket to the deck while the vessel is in the trough of the swell and then immediately slack off the line. Watson admitted at trial there is no specific API standard on this point and, instead, the standards state only that the basket should be lowered gently to the deck. Nevertheless, Watson testified based on his many years of experience that Johnson used the correct method for lowering the basket to the deck and that Johnson's actions were reasonable under the circumstances and did not constitute negligence.

Upon consideration of the evidence, the Court finds Watson's expert opinion more persuasive than that of Madeley. Unlike Madeley, Watson's primary area of expertise is crane operations and safe practices and procedures of crane operations. Watson has trained hundreds of crane operators and riders on how to perform personnel basket transfers. Notably, Watson provided specific, compelling testimony on the proper way to conduct personnel basket transfers and a well-supported opinion that Johnson was not negligent when transferring Richardson from the INTERVENTION to the M/V CHASE. The Court is thus persuaded by Watson's testimony that the proper method to ride a personnel basket is to keep two feet on the basket at all times until the basket securely lands on deck, and the proper method for a crane operator to set a personnel basket down when a waiting vessel is riding a swell is to lower the basket to the deck while the vessel is in the trough of the swell, at which point the operator should

immediately slack off the line. The Court is persuaded by Watson's analysis of Johnson's actions during the personnel basket transfer and adopts his opinion that Johnson complied with industry standards and was not negligent.

## CONCLUSIONS OF LAW

Richardson filed suit against SEACOR asserting ordinary negligence claims pursuant to the general maritime law.[11] The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which confers on the federal district courts original jurisdiction over admiralty and maritime claims. Venue and personal jurisdiction are not disputed and are therefore established.

To state a cause of action for negligence under general maritime law, a "plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury."[12] "[A] party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries," which "is something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."[13] Additionally, the comparative negligence doctrine of general maritime law "bars an injured party from recovering for damages sustained as a result of his own fault."[14] If more than one party is responsible, liability is apportioned on the basis of fault.[15]

Richardson bears the burden of proving by a preponderance of the evidence that SEACOR was negligent. Under general maritime law, a defendant owes a duty of

---

[11] R. Doc. 1.
[12] *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).
[13] *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (internal quotation marks and citations omitted).
[14] *Boudreaux v. United States*, 280 F.3d 461, 466 (5th Cir. 2002).
[15] *See id.*

ordinary care under the circumstances, including the duty to provide a safe means of ingress to and egress from the vessel.[16] The Court finds SEACOR owed a duty to provide Richardson a reasonably safe means of egress from the liftboat. The Court finds Richardson has not established by a preponderance of the evidence that SEACOR breached this duty, let alone that SEACOR's alleged negligence was the legal cause of Richardson's injuries.

Based on the credible testimony of SEACOR's fact witnesses who stated they saw Richardson prematurely take one foot off the basket in an attempt to step off the basket before it landed on the deck, and Robert Watson's expert opinion that Johnson followed industry standards and was not negligent in responding to Richardson's actions, the Court finds the Plaintiff has not proven by a preponderance of the evidence the elements required to establish negligence under general maritime law. The Court finds SEACOR did not breach its duty to provide Richardson a reasonably safe means of egress from the liftboat to the crew boat. The Court finds the sole cause of the incident was Richardson's unsafe decision to take one foot off the basket and attempt to step onto the deck of the crew boat before the basket safely landed on the deck of the M/V CHASE. This action was contrary to his training and the industry's best practice, which is to keep two feet on the basket until the basket reaches the deck.

---

[16] *See Lowry v. Overseas Bulk Tank Corp.*, 62 F.3d 397 (5th Cir. 1995) (unpublished) ("Included with this duty [toward those lawfully aboard the vessel who are not crewmembers] is the duty to provide a safe means of ingress to the vessel."); *Hebert v. Specialized Envtl. Res. LLC*, No. 12-0071, 2013 WL 1215443, at *5 (E.D. La. Mar. 25, 2013) (Feldman, J.) ("General maritime law imposes a duty on vessel owners to provide a reasonably safe means of ingress and egress to its passengers."); *see also Ross v. John E. Graham & Sons*, 189 F.3d 466 (5th Cir. 1999) (unpublished) ("A vessel owner must provide a passenger with a reasonably safe means of boarding or disembarking, including the provision of proper gangways, landing places, and personnel assistance."); *Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 677 (5th Cir. 1969) (stating "the Judge seemed to ignore the basic nature of the case—the duty of Shipowner to afford a safe ingress and egress to crew members coming aboard or leaving the derrick barge"); *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 336 (5th Cir. 1993) ("In such a case, the wharfowner does not undertake to provide a gangplank because everyone assumes the vessel will provide its crew with adequate means of egress and ingress.").

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, the Court finds that Plaintiff Anthony Richardson, Jr. has failed to meet his burden of proving that SEACOR breached its duty to provide him a safe means of egress from the INTERVENTION. Accordingly, the Court finds that the Defendant SEACOR Liftboats LLC is entitled to judgment in its favor. The Court will enter a judgment to that effect by separate order.

**New Orleans, Louisiana, this 16th day of July, 2015.**

_____
SUSIE MORGAN
UNITED STATES DISTRICT JUDGE